Filed 10/23/18

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re MARIA Q. et al., Persons Coming Under the Juvenile Court Law. | D073296 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. NJ14478) |
| v. | |
| Y.M. et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of San Diego County, Michael J. Imhoff, Commissioner.  Affirmed.

Richard L. Knight, under appointment by the Court of Appeal, for Defendant and Appellant Y.M.

Marisa L.D. Conroy, under appointment by the Court of Appeal, for Defendant and Appellant V.C.

Thomas E. Montgomery, County Counsel, John Philips, Chief Deputy and Jesica Fellman, Deputy County Counsel, for Plaintiff and Respondent San Diego County Health and Human Services Agency.

Gary S. Plavnick for Respondent N.Z.

This appeal concerns whether the relative placement preference under Welfare & Institutions Code[1] section 361.3 applies to a relative's request for placement after the juvenile court has held a section 366.26 hearing and the child remains in foster care pursuant to section 366.26, subdivision (b)(7). Before we set out the arguments, we briefly describe the unusual procedural posture of this case.

Y.M. has four children who are dependents of the juvenile court: two daughters, Maria Q. and J.M., and two sons, W.Q. and J.Q. Maria and J.M. (the girls) were placed together in the foster care home of the Z.'s in August 2013, where they remained throughout the proceedings. W.Q. and J.Q. (the boys) had several foster care placements. Y.M. identified Aunt as a possible placement for the children in May 2014. The juvenile court terminated reunification services in December 2014. Various issues substantially delayed the section 366.26 hearing, which was not heard until July 2016.

Shortly before the section 366.26 hearing, issues arose concerning the viability of the Z.'s foster care license and their ability to adopt the girls. In view of the boys' lack of stability and the uncertainty about the Z.'s ability to adopt the girls, the juvenile court continued the children's placement in foster care with the goal of finding a permanency

---

[1]    Unspecified statutory references are to the Welfare and Institutions Code.

plan including adoption, guardianship, placement with a fit and willing relative, or return home.

In August 2017, V.C., the children's maternal great-aunt (Aunt), filed a section 388 petition asking the juvenile court to place the children in her care. The Agency supported Aunt's petition for the girls' placement but opposed placement of the boys, whose foster care parents wanted to adopt them. At a bifurcated hearing, the juvenile court declined to apply the relative placement preference under section 361.3, found that it was not in Maria's and J.M.'s best interests to be placed with Aunt, and continued their section 366.26 hearing. The court summarily denied Aunt's petition for placement of W.Q. and J.Q. In January 2018, at a second section 366.26 hearing, the juvenile court terminated parental rights to W.Q. and J.Q. and designated their foster parents as their prospective adoptive parents.

Y.M. and Aunt (together, Appellants) appeal the denial of Aunt's section 388 petition for placement of the children. They join in each other's arguments. Appellants rely on *In re Isabella G.* (2016) 246 Cal.App.4th 708 (*Isabella G.*), in which this court held that when a relative made a timely request for placement of a dependent child and the social services agency did not properly respond to that request, the relative placement preference applies after reunification services have been terminated. Appellants argue the juvenile court erred when it applied a "generalized" best interest of the child standard under section 388 instead of evaluating the placement under the factors listed in section

3

361.3, subdivision (a). They further contend if the orders denying placement are reversed, this court must also reverse the orders terminating parental rights.[2]

In supplemental briefing,[3] Appellants argue the juvenile court erred when it proceeded under section 388 instead of holding a post-permanency review hearing under 366.3 to determine whether continued foster care was appropriate for the children and to evaluate Aunt's request for relative placement under section 361.3. Appellants contend the procedural errors deprived them of their rights to a full and fair hearing under the appropriate statute, and prejudicially violated their due process rights.

Respondent Agency argues Appellants have forfeited any argument regarding the application of section 361.3 to Aunt's request for placement. The Agency submits when

[2]  Y.M. makes this argument conditionally with respect to Maria and J.M., noting that a section 366.26 hearing scheduled for January 2018 had not yet been held at the time the briefs were filed.

On August 1, 2018, Respondent N.Z., the girls' foster father, asked this court to take judicial notice of July 9, 2018 juvenile court orders terminating parental rights to Maria and J.M., and designating the Z.'s as the girls' prospective adoptive parents. In view of the arguments raised on appeal, we grant the request for judicial notice of the minute orders filed on July 9, 2018 in Maria's and J.M.'s cases.

We deny N.Z.'s opposed request for judicial notice, filed June 8, 2018, entitled "Motion to Augment/Supplement Record on Review with Post Judgment Evidence of Changed Circumstances."

[3]  In view of the different procedural postures of *Isabella G., supra,* 246 Cal.App.4th 708 and this case, we asked the parties to file simultaneous letter briefs addressing the following issues: "In view of Welfare and Institutions Code sections 366.26, subdivision (b)(6) and 366.3, subdivisions (h)(1) and (i), do sections 361.3 and/or 388 apply to a relative's request for placement of a child in a permanency plan of long-term foster care? (See, generally, California Rules of Court, rule 5.740; *San Diego Co. Dept. of Social Services v. Superior Court* (1996) 13 Cal.4th 882.) If the court was required to proceed under Welfare and Institutions Code sections 366.26 and 366.3, were Appellants prejudiced by any procedural or substantive error?"

a child is in post-permanency foster care, sections 366.3 and 366.26 govern the juvenile court's consideration of relative placement, and section 361.3 does not apply.

Minors W.Q. and J.Q. join in the Agency's arguments, and further state that even if the juvenile court was required to proceed under sections 366.26 and 366.3, any error in proceeding under section 388 in their cases was harmless in view of the legislative preference for adoption over relative placement.

Minors Maria and J.M. contend section 361.3 applies to a relative's request for placement of a child who is in a permanency plan of long-term foster care. They argue although the relative preference under section 361.3 still applies, it is subject to a mandatory preference for adoption by qualified current relative or foster caregivers. (§ 366.26, subd. (k)(1).)

Respondent N.Z., Maria's and J.M.'s foster father, asserts the juvenile court applied the correct legal standard to Aunt's request for placement of the girls and did not abuse its discretion in continuing the girls' placement in foster care.

In this issue of first impression, we conclude that the directive under section 361.3 to give preferential consideration to a relative seeking placement does not apply to relatives seeking placement of a child in continued foster care pursuant to section 366.26, subdivision (b)(7). A placement request by a relative after a permanency hearing is essentially a request to modify the child's permanency plan and must be heard under the statutory framework of sections 366.26 and 366.3. The Legislature favors a permanency plan of permanent placement with a fit and willing relative only if a child is in continued foster care and the preferred plans of adoption or guardianship are not available for the

5

child.  (§ 366.26, subds. (b) & (c)(1)(A).)  In assessing a relative's request to permanently care for a child, the juvenile court is required to consider the agency's assessment report, which must include all of the factors specified in section 361.3, subdivision (a) and section 361.4.  (§§ 366.26, subd. (b), 366.3, subd. (i).)

We further hold that when a relative of a dependent child files a section 388 petition requesting permanent placement of a child in continued foster care, the juvenile court should determine whether the petition makes a prima facie showing that the relative is fit and willing to care for the child and if so, set a post-permanency review hearing under section 366.3.  At that hearing, the court is required to consider all available permanency plan options for the child.  The court must set a section 366.26 hearing unless it determines that holding a section 366.26 hearing is not in the best interest of the child, as defined in section 366.3, subdivision (h)(1).  The procedures specified in section 366.26 are the exclusive procedures for selecting a permanency plan for a dependent child.  (§ 366.26, subd. (a).)

Notwithstanding the procedural problems in this case, we conclude that any error in hearing the matter under section 388 was harmless.  Because a permanency plan of adoption by W.Q.'s and J.Q.'s current caregivers was available, the juvenile court did not have any authority to order a different permanency plan.  With respect to Maria and J.M., although the juvenile court declined to formally consider the relative placement factors under section 361.3, the record shows the juvenile court applied those factors in determining the children's best interests and did not make a "generalized" best interest

6

finding.  The juvenile court's findings are amply supported by the record.  We therefore affirm the orders denying Aunt's request for placement of the children.

FACTUAL AND PROCEDURAL BACKGROUND

In June 2011, Maria, W.Q., and J.Q., then ages four, three, and two years old, respectively, were removed from their parents' home due to inadequate supervision, parental substance abuse, domestic violence and physical abuse.  In September 2012, the children were returned to the care of their mother, Y.M., under a family maintenance plan.[4]

In August 2013, the Agency substantiated reports that Y.M. was physically abusing the children and her boyfriend was sexually abusing six-year-old Maria.  The Agency detained the children, including newborn J.M., in protective custody, and placed Maria and J.M. with the Z.'s.  The boys were placed together in another foster care home.

Maria had small moon-shaped scars across her chest where her mother had pinched her with her fingernails.  Maria said Y.M.'s boyfriend would touch her private parts until they were hurting and bleeding, and her mother knew and did not help her. The boyfriend forced W.Q. and J.Q. to watch pornography with him.  Maria, W.Q. and J.Q. reported that Y.M. hit them with a belt and other objects.

Maria said she was afraid of Y.M.  In November 2013, she urinated on herself when she realized her mother was on the telephone.  Maria was diagnosed with

---

4     The circumstances of the children's fathers are not relevant to the issues raised in this appeal.

posttraumatic stress disorder (PTSD). She had thoughts of suicide and self-harm. In later reports, the social worker said Maria's feelings of safety were increasing in the Z.'s home. Maria insisted she did not want to see her mother and the court later suspended visitation.

As an infant, J.M. appeared to develop normally. At one year of age, she started to display unusually aggressive behaviors and intense tantrums. At age three, J.M. was diagnosed with pervasive developmental disorder and autism spectrum disorder. She was a client of the San Diego Regional Center and received in-home applied behavioral services (ABS).

W.Q. and J.Q. were assessed with adjustment disorders. They were physically aggressive, especially with each other. J.Q. was described as excessively active, impulsive, hot tempered, and aggressive. He acted out sexually, which led to the suspension of visitation between the two sets of siblings.

The Agency assessed a maternal aunt for placement but she did not receive a favorable home evaluation. Several months later, in May 2014, Y.M. identified Aunt as a possible placement for the children. A social worker later testified the record did not indicate, and she did not know, whether the previous social worker followed up on Y.M.'s information that Aunt was a possible placement for the children.

In August 2014, the juvenile court granted the Z.'s application for de facto parent status for Maria and J.M.

The juvenile court terminated reunification services in December 2014. The Agency reported that Maria and J.M. were attached to the Z.'s and had developed a strong bond with them.

8

In a report prepared for a section 366.26 hearing scheduled for April 2015, the social worker reported that the Z.'s were interested in adopting Maria and J.M. The Agency did not identify any potential adoptive placements for the boys. The section 366.26 hearing was not held until July 2016.

In September 2015, a physician diagnosed Maria with anxiety, intermittent irritability, insomnia and avoidance symptoms. The physician noted that Maria had been in therapy for two years with minimal improvement and prescribed psychotropic medication for her.

In June 2016, the boys' foster parents called the police after J.Q. threatened to kill W.Q. and the foster family, which was one in a series of crises that had been precipitated by J.Q.'s behaviors. J.Q. was placed with new foster parents (Caregivers). In November 2016, after J.Q.'s behaviors stabilized, W.Q. was placed with Caregivers.

The children's maternal grandmother (Grandmother) requested placement of the children. The Agency did not consider Grandmother for placement because she had a child welfare history. The social worker asked Y.M. and Grandmother for names, addresses, and other information of any other maternal and paternal relatives who could be considered for placement, but Y.M. and Grandmother did not respond to the social worker's request.

In July 2016, in view of the children's mental and behavioral health issues and the uncertainties of their current placements, the juvenile court ordered permanency plans of long-term foster care for the children. The same day, Y.M. filed a section 388 petition asking the court to place the children with Grandmother. In February 2017, the juvenile

9

court determined it was not in the children's best interests to be placed with Grandmother, and set a new section 366.26 on behalf of W.Q. and J.Q.

In March 2017, at a post-permanency plan review hearing, the Agency asked the juvenile court to set a new section 366.26 hearing on behalf of Maria and J.M. The social worker said the girls' foster mother, M.Z., was steadfast in her commitment to provide a permanent home to them.

In May 2017, Aunt contacted the social worker asking for placement of the children. The social worker submitted a referral to the Agency for an assessment of Aunt's home. On August 1, 2017, Aunt filed a section 388 petition asking for visitation with, and custody of, the children. The juvenile court held a prima facie hearing on Aunt's section 388 petition. Aunt said she had learned the children were in foster care four years earlier. She had requested placement of the children in 2015 but a social worker told her that Grandmother's request for placement had priority and Aunt would need to wait to be considered for placement until Grandmother's application had been processed.

The social worker, noting the Z.'s faced the possible revocation of their foster care license and could not offer permanency to the girls within a reasonable time, recommended the juvenile court place Maria and J.M. with Aunt. The social worker was also concerned about the Z.'s lack of consistency in securing mental health services for Maria and ABS services for J.M. The Agency opposed Aunt's request for placement of W.Q. and J.Q. because their foster parents wanted to adopt them. In addition, due to the children's issues, the two sets of siblings could not be placed together.

10

The juvenile court granted Aunt a hearing on her section 388 petition for Maria's and J.M.'s placement. The court raised the issue whether Aunt's petition should be decided under the recent case *Isabella G.*, *supra,* 246 Cal.App.4th 708 or under section 388. The court asked Aunt to clarify whether she was trying to proceed under *Isabella G.*, and said if she did not make an affirmative showing that the case applied, the court would proceed under section 388.

A hearing on Aunt's section 388 petition was held on November 29, December 21 and 22, 2017. The social worker reported that a state administrative review of the Z.'s foster care license might not be resolved for six to 12 months. In May or June 2016, the Agency had investigated an allegation against the foster father from years earlier and found it to be inconclusive. Nevertheless, the licensing board was seeking to revoke the Z.'s foster care license. That issue needed to be resolved before the Agency could even start the Z.'s adoptive home study.

The social worker said Aunt had a strong family and community support system and had identified services to meet the girls' needs. Her home was approved for placement, she had completed specialized classes for caring for traumatized children, and she was willing to adopt the girls and ensure they received all necessary mental health services.

In testimony, the social worker acknowledged that Maria and J.M. had lived with the Z.'s for more than four years and called M.Z. "mama." Maria felt safe with the Z.'s and wanted to stay with them. However, the Z.'s did not follow through with Maria's mental health services and J.M.'s services to treat autism. While the Z.'s always met the

11

girls' basic needs, they were unable or unwilling to meet their needs for therapeutic services. The social worker said her decision to support Aunt's petition for placement of the girls was not an easy one. Maria would have difficulty transitioning from the Z.'s home. Nevertheless, in assessing Maria's and J.M.'s long-term interests, the social worker believed the children's natural family could provide permanency to the girls.

Y.M.'s attorney asked the social worker about Aunt's earlier contacts with the Agency. The social worker acknowledged Y.M. had asked the Agency to evaluate Aunt's home for placement in 2014. The juvenile court asked whether Y.M. was proceeding on "an *Isabella G.* type of theory" and, if so, whether section 361.3 applied to a post-permanency request for placement. Y.M. responded that under an *Isabella G.* theory, the relative placement preference would apply until parental rights were terminated. Other parties disagreed. The juvenile court said Y.M. was free to pursue questioning but advised the court's decision was unlikely to turn on that issue.

On further questioning, the social worker verified that on May 9, 2014, Y.M. informed the social worker that Aunt was interested in caring for the children. The social worker did not know whether the Agency had investigated any relatives, including Aunt, for placement at that time.

Aunt said Y.M. and Maria had lived with her intermittingly until Maria was three years old. Aunt first talked to the social worker about the children's placement in 2014 or 2015, but the social worker told her that Grandmother had priority for placement. Aunt submitted a placement application to the Agency in April 2017. She completed the classes the Agency required and educated herself about autism. Aunt believed that Maria

12

needed extensive therapy to overcome her trauma. Maria and J.M. were at an age where they could adapt to a new home, knowing their future would be safe and secure. Aunt wanted to care for the girls because she loved them and saw them as her daughters.

Maria testified she had lived with her foster parents for about four years and called them "mom" and "dad." Her two older sisters helped her with her homework. Maria's foster father, N.Z., was not living in the home right now. She missed him very much. No one in the foster home had ever hurt her or touched her inappropriately.

Maria said therapy was "weird" because she did not want to talk about what had happened to her. She saw a counselor at school. She was happy. Therapy wasted her time. Maria remembered taking medication but it did not make her feel better. Maria did not want to visit Aunt but they forced her to go. She did not want to live with Aunt. Maria had lived with the Z.'s longer than she had lived anywhere. She said her foster parents were "like my family now." Her sister had lived with them her entire life and they were "like her real parents to her." Maria said Aunt had had four years to express an interest in her and J.M., and now she just wanted to come and take them.

Foster mother M.Z. testified that Maria, J.M., and her two daughters, ages 13 and 17, lived in the home. Her husband had been out of the home for several months because of an allegation he had sexually abused a relative in 1999. There were no criminal charges against her husband. M.Z. did not believe the allegation was true but was willing to live separately from her husband for whatever time was necessary to keep the girls in her care. She was as attached and committed to Maria and J.M. as she was to her own daughters.

13

M.Z. said that after several years, Maria refused to continue therapy but acquiesced to seeing a counselor at school. Maria refused to take medication, saying it made her feel bad and she "had her rights." There were no current medication recommendations for Maria. M.Z. said she was not happy with J.M.'s ABS program and explained why. She met with the provider without being able to resolve her concerns and did not continue with that program. M.Z. found a different ABS program. J.M. recently had her first session in that program.

The children's court appointed special advocate (CASA) recommended against moving the girls from the foster home. Maria and J.M. trusted the Z.'s and had a strong bond with them. The CASA believed any transition from their home would be traumatic for the girls. Maria was a shy 10 year old with a "stubborn streak." She still showed signs of trauma. J.M. was a beautiful four year old who had made progress with language and behavior at home and at preschool. Maria and J.M.'s attorney/guardian ad litem also opposed their placement with Aunt.

The juvenile court found that Aunt truly cared about the girls and had carried her burden to show a change in circumstances. The court said M.Z. should not have allowed Maria to unilaterally discontinue psychotropic medication and was lucky Maria did not suffer any harm as a result. The court credited M.Z.'s explanations for the reasons she did not continue with J.M.'s ABS program and Maria's therapy, but faulted her for not reaching out to the social worker and other professionals to avoid a lapse in services.

With respect to the children's best interests, the court found that Maria and J.M. were an attached sibling group and should not be separated. Maria had been

14

"unbelievably traumatized" by the maternal family. She did not have any current attachment to Aunt. Maria was very anxious about the uncertainty of her permanent placement and was irritated because the adults were not listening to her. The court said it shared the Agency's concerns about the viability of a permanent placement with the Z.'s, but without therapeutic input it could not conclude it would be in Maria's best interests to place her with Aunt against her wishes. The court denied Aunt's petition for Maria's and J.M.'s placement and continued their section 366.26 hearing.

The juvenile court proceeded with an initial hearing on Aunt's 388 petition for placement of W.Q. and J.Q. The court found that Aunt did not make a prima facie showing that a change in placement was in the boys' best interests. W.Q. and J.Q. had significant emotional and behavioral issues and now felt safe and secure with Caregivers. The court summarily denied Aunt's petition and set a section 366.26 hearing for W.Q. and J.Q.

On January 2, 2018, the court terminated parental rights to the boys and designated Caregivers as their prospective adoptive parents. On July 9, 2018, the court terminated parental rights to the girls and designated the Z.'s as their prospective adoptive parents.

DISCUSSION

I

*FORFEITURE*

The Agency argues Appellants have forfeited the issue whether section 361.3 applies by failing to object to the juvenile court's decision to proceed under section 388.

15

"A party forfeits the right to claim error as grounds for reversal on appeal when he or she fails to raise the objection in the trial court. [Citations.] Forfeiture . . . applies in juvenile dependency litigation and is intended to prevent a party from standing by silently until the conclusion of the proceedings." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 221-222 (*Dakota H.*).)

The Agency points out Y.M. and Aunt did not respond to the juvenile court's initial request for further briefing of the issue and did not argue the court should assess the case under section 361.3 during closing argument. The Agency acknowledges that at the contested hearing, Y.M. tried to establish Aunt came forward for placement early in the case and the Agency did not respond to her request, which arguably would have allowed the court to assess the placement request under section 361.3. (See *Isabella G.*, *supra*, 246 Cal.App.4th at p. 712 [when a relative makes a timely request for placement of the child, and the agency does not complete a relative home assessment as required by law, the relative requesting placement is entitled to a hearing under section 361.3, even if reunification services have been terminated].)

The record shows the juvenile court raised the issue of whether section 361.3 applied under *Isabella G., supra,* 246 Cal.App.4th 708 and Y.M. pursued the issue in questioning Aunt. Y.M. argued that under *Isabella G.*, section 361.3 applies until parental rights are terminated. The court asked the other parties about their position on the issue. County counsel, minors' counsel, and the Z.'s attorney argued section 361.3 did not apply. The issue was sufficiently addressed by the juvenile court during the

16

proceedings to avoid a claim of forfeiture on appeal.[5]  (Cf. *Dakota H.*, *supra*, 132 Cal.App.4th at pp. 221–222.)

## II

## *STANDARD OF REVIEW*

The issue whether the relative placement preference under section 361.3 applies when a child remains in foster care after a section 366.26 hearing is a question of law, which we review de novo.  (*People v. Figueroa* (1999) 68 Cal.App.4th 1409, 1413 [interpretation and applicability of a statute is a question of law].)  Under settled rules of statutory construction, we ascertain the Legislature's intent to effectuate the law's purpose.  In so doing, we look to the words of the statute and give the words their usual and ordinary meaning.  The plain meaning of the statute controls our interpretation.  (*In re Jose S.* (2017) 12 Cal.App.5th 1107, 1113.)  In view of the complexity of the dependency statutory scheme, a single provision " 'cannot properly be understood except in the context of the entire dependency process of which it is part.' "  (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1235, quoting *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 253.)

---

[5]    To the extent, if any, the issue was forfeited by Aunt's failure to respond to the juvenile court's request to affirmatively show that *Isabella G., supra,* 246 Cal.App.4th 708 applied, we exercise our discretion to review the issue on the merits, which poses a question of law.  (*In re Julien H*. (2016) 3 Cal.App.5th 1084, 1089; see *In re S.B.* (2004) 32 Cal.4th 1287, 1293-1294.)

17

III

*RELEVANT LEGAL PRINCIPLES*

"The best interest of the child is the fundamental goal of the juvenile dependency system, underlying the three primary goals of child safety, family preservation, and timely permanency and stability." (*In re William B.* (2008) 163 Cal.App.4th 1220, 1227 (*William B.*).) The Legislature "command[s] that relatives be assessed and *considered* favorably, subject to the juvenile court's consideration of the suitability of the relative's home and the best interests of the child." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 320 (*Stephanie M.*).) This directive applies throughout a child's dependency proceedings but is governed by different standards depending on whether the issue arises during the reunification period, in the interim between termination of reunification services and a section 366.26 hearing, or after a permanency plan has been selected for a child.

At the outset of the case and during the reunification period, the agency and juvenile court are required to give "preferential consideration" to a relative's request for placement, which means "the relative seeking placement shall be the first placement to be considered and investigated." (§ 361.3, subd. (c)(1); *Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1032 (*Cesar V.*).) Within 30 days from the child's detention in protective custody, the social worker is required to conduct an investigation to identify and locate all grandparents, adult siblings, and other adult relatives of the child, and provide information about the child's status to suitable relatives, and must "contact the

18

relatives given preferential consideration for placement to determine if they desire the child to be placed with them."[6]  (§§ 309, subd. (e)(1), 361.3, subd. (a)(8)(B).)

In assessing any relatives who would like the child to be placed in their care, the Agency and the juvenile court are required to consider the factors described in section 361.3, subdivision (a), and any other factors the juvenile court may deem relevant to the child's particular circumstances.  The first and foremost of these factors is "[t]he best interest of the child, including special physical, psychological, educational, medical, or emotional needs."  (§ 361.3, subd. (a)(1);[7] see *William B.*, *supra*, 163 Cal.App.4th at p. 1227.)

---

[6]    At the time of the dependency court proceedings at issue in this case, the Legislature defined relatives entitled to preferential consideration as "an adult who is a grandparent, aunt, uncle or sibling."  (§ 361.3, subd. (c)(2), Stats. 2012, ch. 845, § 7, eff. Jan. 1, 2013.)  The Legislature deleted this language from section 361.3, subdivision (c)(2), effective January 1, 2018.  The statute no longer limits preferential placement consideration to a grandparent, aunt, uncle or adult sibling.  Instead, any adult who is related to the child by blood, adoption or affinity within the fifth degree of kinship is entitled to preferential consideration.  (§ 361.3, subd. (c)(2), Stats. 2017, ch. 732, § 47.)

[7]    Other factors include, in pertinent part:  ". . . [¶] (2) The wishes of the parent, the relative, and child, if appropriate. [¶]  (3) The provisions of . . . the Family Code regarding relative placement.  (4) Placement of siblings and half-siblings in the same home . . . . [¶]  (5) The good moral character of the relative and any other adult living in the home, including whether any individual residing in the home has a prior history of violent criminal acts or has been responsible for acts of child abuse or neglect. [¶] (6) The nature and duration of the relationship between the child and the relative, and the relative's desire to care for, and to provide legal permanency for, the child if reunification is unsuccessful. [¶]  (7) The ability of the relative to do the following:  [¶]  (A) Provide a safe, secure, and stable environment for the child. [¶]  (B) Exercise proper and effective care and control of the child. [¶]  (C) Provide a home and the necessities of life for the child. [¶]  (D) Protect the child from his or her parents.  [¶] . . . [¶]  (F) Facilitate visitation with the child's other relatives. [¶]  (G) Facilitate implementation of all elements of the case plan. [¶]  (H) Provide legal permanence for the child if reunification

19

"Appellate court decisions have consistently held that the relative placement preference applies at least through the family reunification period.  [Citations.]  During the reunification period, the preference applies regardless of whether a new placement is required or is otherwise being considered by the dependency court."  (*In re Joseph T.* (2008) 163 Cal.App.4th 787, 795 (*Joseph T.*); *In re Sarah S*. (1996) 43 Cal.App.4th 274, 285.)  If a new placement is required during the reunification period, the child welfare agency has an independent, affirmative duty to seek out relatives who would qualify for the relative placement preference.  (*Joseph T.*, *supra*, at p. 796, fn. 4.)  *Joseph T.* did not resolve the question whether the preference for relative placement applies after reunification services have been terminated.  (*In re R.T.* (2015) 232 Cal.App.4th 1284, 1300.)

This court addressed the issue of post-reunification relative placement in *Isabella G.*  There, the child's paternal and maternal grandparents and great-grandparents asked to be considered for placement prior to the dispositional hearing and continued to request placement.  The Agency misinformed the relatives about placement policies and did not conduct the assessments required under section 361.3.  (*Isabella G.*, *supra*, 246 Cal.App.4th at pp. 722-723.)  This court held that the relative placement preference applies after the reunification period where the relative has come forward seeking placement of the child during the reunification period and the agency has ignored the relative's request for placement.  (*Id.* at p. 723.)

---

fails. [¶] . . . [¶]  (I) Arrange for appropriate and safe child care, as necessary. [¶] (8)(A) The safety of the relative's home."  (§ 361.3.)

*Isabella G., supra,* 246 Cal.App.4th 708 did not address whether the relative placement preference applies after the court has held a permanency plan hearing under section 366.26. To resolve this issue, we first examine the statutory scheme governing the selection and implementation of a dependent child's permanency plan.

At a section 366.26 permanency planning hearing, the juvenile court determines a permanent plan of care for a dependent child. (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 394-395.) Under section 366.26, subdivision (a), "[t]he procedures specified in this section are the exclusive procedures for conducting these hearings."

To provide stable, permanent homes for dependent children, section 366.26, subdivision (b) requires the juvenile court to make findings and orders *in the following order of preference*: (1) termination of parental rights and placement for adoption; (2) tribal customary adoption; (3) legal guardianship by a relative with whom the child is currently residing; (4) identification of adoption or tribal customary adoption as the permanent placement goal and continuation of efforts to locate an appropriate adoptive family for the child within a period not to exceed 180 days; (5) appointment of a nonrelative legal guardian; (6) permanent placement with a fit and willing relative; and (7) continued foster care.[8] (§ 366.26, subd. (b).) " 'Only if adoption is not possible, or if

---

[8]    During the proceedings in this case, the Legislature modified section 366.26 to add a plan of permanent placement with a fit and willing relative, effective January 1, 2016. (Stats. 2015, ch. 425, § 13.) At the same time, it amended language permitting the juvenile court to order that the child be placed in long-term foster care to "order that the child *remain* in foster care, subject to the conditions described in [section 366.26, subdivision (c)(4)]." (*Ibid.*; italics added.)

there are countervailing circumstances, or if it is not in the child's best interests are other, less permanent plans, such as guardianship or long-term foster care considered.' " (*In re Autumn H*. (1994) 27 Cal.App.4th 567, 574 (*Autumn H*.).)

After the selection of a permanency plan, the juvenile court is required to hold periodic review hearings at least every six months under section 366.3 (post-permanency review). (§ 366.3, subd. (d).) At a post-permanency review for a child in continued foster care, the juvenile court is required to consider all permanency planning options for the child including, as relevant here, whether the child should be placed for adoption, appointed a legal guardian, or placed with a fit and willing relative. (§ 366.3, subd. (h)(1).) The Legislature directs the juvenile court to order that a hearing be held pursuant to section 366.26 unless the court determines by clear and convincing evidence there is a compelling reason that holding a section 366.26 hearing is not in the child's best interest. (§ 366.3, subd. (h)(1).)

If the child is not placed for adoption, the juvenile court must find whether the agency has made diligent efforts to locate an appropriate relative and direct the agency to do so if it has not. The court is also required to determine whether each relative whose name has been submitted to the agency as a possible caregiver has been evaluated as an appropriate placement source. If not, the court must direct the agency to do so. (Cal. Rules of Ct.,[9] rule 5.740(a)(6) & (b)(3).)

---

[9]     Further unspecified rule references are to the California Rules of Court.

When the juvenile court orders that a hearing be held pursuant to section 366.26, the court is required to direct the agency to prepare an assessment as detailed in section 366.21, subdivision (i), or section 366.22, subdivision (b).[10] (§ 366.3, subd. (i).) The assessment must include an evaluation of the child's medical, developmental, scholastic, mental and emotional status, and a review of the amount of and nature of any contact between the child and members of the child's extended family. (§ 366.22, subd. (c)(C)(i).) If a proposed legal guardian is a relative of the child, the assessment must also include, but is not limited to, a consideration of *all of the factors specified in section 361.3, subdivision (a)* and section 361.4. (§§ 366.21, subd. (i), 366.22, subd. (c)(1)(D).)

To summarize, when a dependent child has been removed from his or her home, the Legislature expresses a clear preference for placement with a relative, if the home is appropriate and the placement is in the child's best interest. (*Stephanie M.*, *supra*, 7 Cal.4th at p. 320.) The relative placement preference under section 361.3 applies throughout the reunification period. (*R.T.*, *supra*, 232 Cal.App.4th at p. 1300.) In addition, section 361.3 applies after the reunification period where the relative has made a timely request for placement during the reunification period and the child welfare

---

10    Section 366.3, subdivision (i) refers to the assessment found in section 366.22, subdivision (b). Assessment requirements in section 366.22 are now found in subdivision (c).

agency has not met its statutory obligations to consider and investigate the relative seeking placement.[11] (*Isabella G.*, *supra*, 246 Cal.App.4th at p. 723.)

We now turn to the question whether section 361.3 applies where a relative requests placement of a child who remains in foster care after a section 366.26 hearing. This appears to be an issue of first impression. Our discussion takes place in the context of the juvenile court's finding that Maria, W.Q., J.Q. and J.M. were not proper subjects for adoption and there was no one willing to accept legal guardianship, and the order that the children remain in foster care with the goal of finding a permanency plan, including placement with a fit and willing relative.

IV

*ANALYSIS*

A

*The Juvenile Court Must Follow the Preferred Permanency Plan Order under Section 366.26; However, in Considering Whether to Select a Permanency Plan with a Relative, the Juvenile Court Considers the Relative Placement Factors Listed in Section 361.3*

Aunt contends the relative placement preference under section 361.3 applies to a dependent child who remains in foster care following a section 366.26 hearing. Maria and J.M. agree the section 361.3 preference applies but point out that relative placement is subject to the mandatory preference for adoption by the child's caregivers. The Agency, N.Z., and W.Q. and J.Q. by implication, assert section 361.3 does not control a

---

[11]　The issue whether section 361.3 applies where a relative did not come forward to request placement until after the reunification period has not been resolved by reviewing courts.

24

relative's request for post-permanency placement, which is governed instead by sections 366.26 and 366.3. Y.M. agrees sections 366.26 and 366.3 govern a post-permanency request by the child's relative for placement but asserts the juvenile court applies section 361.3 to determine whether the placement is in the child's best interest.

The juvenile court is required to select a permanency plan for the child according to the legislative preferences detailed in section 366.26, subdivision (b). (See also § 366.3, subd. (h).) Permanent placement with a relative is a permanency plan option. (§ 366.26, subd. (b)(6); see rule 5.740(a)(6) & (b)(3) [directing the juvenile court to order the agency to make diligent effort to identify and locate relatives as a placement source for a child in continued foster care].) Nevertheless, it is axiomatic that adoption, then guardianship, are the preferred permanency plans. (*Autumn H*., *supra*, 27 Cal.App.4th at p. 574; see also § 366.26, subd. (b)(4).) Thus, permanent placement with a fit and willing relative is favored *only* over continued foster care and is disfavored if any other permanency plan is available. (§ 366.26, subd. (b).)

In view of the statutory preferences established by the Legislature to select a child's permanency plan (§ 366.26, subd. (b)), the directive in section 361.3, subdivision (a) to give "preferential consideration . . . to a request by a relative of the child for placement of the child with the relative" does not apply. (§ 366.3, subd. (h).) Our conclusion is supported by the Legislature's express directive that preferential consideration under section 361.3 be given to relatives in the event the adoption of a previously dependent child was disrupted, set aside, or voluntarily relinquished. (§ 361.3, subd. (f)(2).) "[I]f a statute 'referring to one subject contains a critical word or

25

phrase, omission of that word or phrase from a similar statute on the same subject generally shows a different legislative intent.' " (*In re Rudy L.* (1994) 29 Cal.App.4th 1007, 1011; *Gikas v. Zolin* (1993) 6 Cal.4th 841, 852 [the expression of one excludes the other].) Had the Legislature wanted the juvenile court to give preferential consideration under section 361.3 to a relative seeking a less favored permanency plan, it would have said so.

Notwithstanding the inapplicability of the relative placement preference at a permanency plan hearing, the juvenile court, in assessing a relative's request to provide permanent care for a child, must consider the factors listed in section 361.3, subdivision (a)(1)-(8) at any permanency plan hearing. The Legislature directs the juvenile court to review the agency's assessment report (§ 366.26, subd. (b)), which must include an evaluation of the child's medical, developmental, scholastic, mental, and emotional status. (§ 366.3, subd. (i).) Further, "if a proposed legal guardian is a relative of the minor, the assessment shall also consider, but need not be limited to, *all of the factors specified in subdivision (a) of Section 361.3* and Section 361.4." (§§ 366.21, subd. (i), 366.22, subd. (c)(D); italics added.)

We are aware that on its face, this provision applies to relatives who are proposed legal guardians of the child. The dependency statutory scheme is complex, made more so by revisions to sections 366.26 and 366.3, effective January 1, 2016. (Stats. 2015, ch. 425, §§ 13 & 14.) A single provision " 'cannot properly be understood except in the context of the entire dependency process of which it is part.' " (*Nolan W.*, *supra*, 45 Cal.4th at p. 1235.) It makes no sense to apply the relative placement factors listed in

26

section 361.3 to a request for placement by a relative during the reunification period and a request for guardianship by a relative at a permanency hearing, and not apply those factors to a request by a relative for the permanent placement of the child. "The literal meaning of the words of a statute may be disregarded to avoid absurd results or to give effect to manifest purposes that, in the light of the statute's legislative history, appear from its provisions considered as a whole." (*Silver v. Brown* (1966) 63 Cal.2d 841, 845; *Lillebo v. Davis* (1990) 222 Cal.App.3d 1421, 1439.) Thus, in assessing whether a permanent plan with a relative (other than adoption, which has its own criteria) is appropriate for the child, the juvenile court must consider the relative placement factors listed in section 361.3 whether the relative is requesting a plan of legal guardianship or a permanent placement plan.

The question remains whether *Isabella G., supra,* 246 Cal.App.4th 708 applies to a post-permanency relative placement request where the agency did not properly consider that relative's request for placement during the reunification period. Assuming, without deciding, that this occurred here, we decline to extend the directive to give "preferential consideration . . . to a request by a relative of the child for placement of the child" to a post-permanency request for placement. (§ 361.3, subd. (a).) To do so would upend the precise statutory scheme governing the selection and implementation of a child's permanency plan. (See §§ 366.26, 366.3.) At the time Aunt filed her petition, the overriding focus of dependency proceedings was not on Aunt's interest in caring for the children but on the children's interests in securing the most stable, safe and secure

27

permanency plans possible under the circumstances. (*In re M.H.* (2018) 21 Cal.App.5th 1296, 1303-1304.)

B

*Any Modification of a Child's Permanency Plan Order Must Be Made Pursuant to Sections 366.26 and 366.3*

A request by a relative for post-permanency placement of a child in continued foster care is essentially a request to modify the order continuing the child in foster care by selecting a new permanency plan for the child. As such, it must be heard under the statutory scheme that governs the selection of a permanency plan. If circumstances have changed since the permanency plan was ordered, the juvenile court may order a new permanency plan under section 366.26 at any subsequent hearing under section 366.3, or any party may seek a new permanency plan by a motion filed under section 388 and rule 5.570. (Rule 5.740(b)(5); *In re J.F.* (2011) 196 Cal.App.4th 321, 330-331.) A *party* may choose to make this request under section 366.3 instead of submitting a petition under section 388 to avoid "a shouldering of the burden inherent therein of pleading and proving change of circumstances." (*San Diego County Dept. of Social Services v. Superior Court* (1996) 13 Cal.4th 882, 889-890.) However, absent any other procedural mechanism, a *relative* seeking modification of an order continuing a child in foster care must file a section 388 motion.

To make a prima facie showing of changed circumstances sufficient to merit a possible modification of an order continuing a child in foster care, the relative must meet a threshold showing that she is fit and willing to permanently care for the child. For a

28

child in continued foster care, a showing "the best interests of the child may be promoted by the proposed change of order" is inherent in the statutory scheme. (See §§ 366.26, subd. (b), 366.3, subd. (h)(1)). Thus, generally, the presumption favoring permanent placement with a fit and willing relative over continued foster care should suffice to make a prima facie showing of best interests under section 388.

If the petitioner meets the prima facie requirements under section 388, the juvenile court should proceed under section 366.3, subdivision (d) (governing post-permanency review hearings for a child in foster care). The juvenile court is required to consider all permanency planning options for the child. The court must set a section 366.26 hearing unless it determines that holding a section 366.26 hearing is not in the child's best interest.[12] Only upon that determination may the juvenile court order that the child remain in foster care without holding a hearing pursuant to section 366.26. (§ 366.3, subd. (h)(1).)

If the juvenile court orders a hearing under section 366.26, it must direct the agency to prepare an assessment report. If the issue of guardianship or permanent placement with a relative is at issue, the assessment must include, but need not be limited

_____

[12] A compelling reason for determining that a hearing held pursuant to section 366.26 is not in the best interest of the child exists where the child is being returned to the home of the parent, the child is not a proper subject for adoption, no one is willing to accept legal guardianship as of the hearing date, or the county adoption agency has determined it is unlikely that the child will be adopted or one of the exceptions to termination of parental rights applies. "The court shall make factual findings identifying any barriers to achieving the permanent plan as of the hearing date." (§ 366.3, subd. (h)(1).)

29

to, the relative placement factors specified in section 361.3, subdivision (a).  (§§ 366.21, subd. (i), 366.22, subd. (b).)  At the section 366.26 hearing, the juvenile court is required to read and consider the assessment report, receive other evidence and then make its findings and orders according to the preferences listed in section 366.26, subdivision (b).  If the juvenile court selects a permanency plan other than permanent placement with a fit and willing relative or continues the child in foster care, it shall also deny the relative's section 388 petition.

V

*ANY ERROR WAS HARMLESS*

The juvenile court did not assess Aunt's section 388 petition for placement as a request to modify the prior order continuing the children's placement in foster care and to select a new permanency plan for the children.[13]  Accordingly, the juvenile court proceeded solely under section 388.  We nevertheless conclude that any error was harmless.

In W.Q.'s and J.Q.'s cases, if the juvenile court had ordered a new section 366.26 hearing (or had included Aunt's petition in the already scheduled section 366.26 hearing), the first question presented would have been whether the children were adoptable. (§ 366.26, subd. (c)(1).)  In view of the Caregiver's wish to adopt the boys, and Aunt's willingness to consider doing so as well, the court would have freed the boys for

---

[13]    In view of the lack of appellate guidance on post-permanency relative placement, this statement should not be construed as criticism of the juvenile court.

30

adoption.[14]  Having selected the preferred permanency plan of adoption, the juvenile court would not have had any authority to order a lesser preferred permanency plan and need not have heard evidence on Aunt's request for permanent placement (or guardianship).  Thus, the summary denial of Aunt's section 388 petition was harmless.  It is not reasonably probably that a result more favorable to Appellants would have been reached in the absence of the error in proceeding under section 388.  (See *People v. Watson* (1956) 46 Cal.2d 818, 836.)  We further conclude that error, if any, in not allowing Aunt to present evidence on the issue of the boys' placement with her was harmless beyond a reasonable doubt.  (See *In re Justice P*. (2004) 123 Cal.App.4th 181, 193.)  The juvenile court was required, as a matter of law, to select adoption as the boys' permanency plans.  (§ 366.26.)

In Maria's and J.M.'s cases, the juvenile court correctly refused to apply the relative placement preference under section 361.3.  The record belies Appellants' assertion the juvenile court incorrectly proceeded under a "generalized" best interest standard of the child pursuant to section 388.  Although the juvenile court did not formally consider the section 361.3 factors, the juvenile court's remarks indicate it conducted a multi-factorial assessment of Maria's and J.M.'s best interests.  Thus, the juvenile court considered the girls' special physical, psychological and emotional needs (see § 361.3, subd. (a)(1)); Maria's wishes as well as those of Y.M. and Aunt (see

---

14    At this point, although Aunt may have submitted an application to adopt the boys, the adoption application of W.Q.'s and J.Q.'s current caregivers would have been given preference.  (§ 366.26, subd. (k).)

§ 361.3, subd. (a)(2)); placement of the siblings in the same home (see § 361.3, subd. (a)(4)); the suitability of Aunt's home (see § 361.3, subd. (a)(5)); the nature and duration of the girls' relationship with Aunt (see § 361.3, subd. (a)(6)); and Aunt's ability to properly care for the girls and provide legal permanence for the children (see § 361.3, subd. (a)(7)). In addition to those non-exclusive factors, the juvenile court also considered the girls' bonds to each other, and their bonds to their foster family, including Maria's attachment to her older foster sisters.

There is ample evidence to support the reasonable inference that J.M., who was placed with the Z.'s before she was three weeks old, viewed the Z.'s as her parents and that removal from their care would be seriously detrimental, if not traumatic, for her. The juvenile court's finding that Maria and J.M. were a bonded sibling group that should not be separated is similarly supported. The record contains ample evidence to support the court's conclusion that Aunt truly cared about Maria and J.M., and that her home was appropriate for placement, but that Maria had been traumatized by her maternal family and did not have any current attachment to Aunt. The court resolved concerns about the Z.'s ability to provide for Maria's therapeutic needs and J.M.'s special needs in the Z.'s favor. Thus the record supports the juvenile court's finding that removing Maria against her wishes from the Z.'s care was not in her best interest, even in view of the uncertainties about the Z.'s ability to provide a permanent placement at the time of the hearing.

The statutory scheme does not require the juvenile court to select a permanency plan of placement with a fit and willing relative where "removal [from the current caregiver] would be seriously detrimental to the emotional well-being of the child

32

because the child has substantial psychological ties to the caregiver."  (Cf. § 366.26, subd. (c)(4)(B)(ii).)  Maria and J.M. have now lived with the Z.'s for more than five years and the record supports the conclusion that they are a bonded, loving family.  We conclude that the outcome of the hearing on Aunt's request for Maria's and J.M.'s placement would not have been different had the court held a new section 366.26 hearing, and explicitly considered the factors listed in section 361.3.  The record supports the finding that permanent placement with Aunt was not the appropriate permanency plan for the girls at that time.  Error in proceeding under section 388 was harmless.  (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

## DISPOSITION

The findings and orders are affirmed.

HUFFMAN, J.

WE CONCUR:


McCONNELL, P. J.


BENKE, J.